UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DOUGLAS RAY STANKEWITZ, | ) | Case No. 1:91-cv-616-AWI |
| | ) | |
| Petitioner, | ) | |
| | ) | <u>DEATH</u> <u>PENALTY</u> <u>CASE</u> |
| vs. | ) | |
| | ) | |
| ROBERT WONG, Acting Warden | ) | Memorandum and Order Granting |
| of San Quentin State Prison, | ) | Petition for Writ of Habeas Corpus |
| | ) | |
| Respondent. | ) | |
| | ) | |

   Petitioner Douglas Ray Stankewitz ("Stankewitz") appears before this

Court pursuant to a partial remand of his petition for a writ of habeas corpus by

the Ninth Circuit. *See Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004).

Stankewitz's initial federal petition was denied on the merits as to all claims

December 22, 2000.  Doc. 448.

   In 2000, as the parties prepared for expert depositions in contemplation of

a federal evidentiary hearing, Stankewitz for the first time produced a

voluminous set of documents he represented were relied on by his experts in

preparing their opinions.  *See* Doc. 443, Notice of Filing, (hereafter "Jointly Filed

Documents").  At the same time, the grant of an evidentiary hearing was vacated,

and Stankewitz's federal petition was subsequently denied.  In denying the

present claim, this Court found that Stankewitz had not established prejudice. Doc. 448, at 83.  Specifically, this Court concluded that: (1) Stankewitz was aware that evidence of his background could be presented, but he had objected to any such testimony; (2) Stankewitz objected at both trials to the presentation of expert testimony; (3) despite Stankewitz's continued opposition to a mental defense, Goodwin had introduced evidence of his background and upbringing through the testimony of Joe Walden, the former director of juvenile probation for Fresno County; and (4) Goodwin's use of Walden may have been a tactical choice (one which this Court noted was also used by counsel at the first trial), "since as a probation officer Mr. Walden could have been seen as having a higher level of credibility than would Stankewitz's family, the majority of whom had either criminal records, histories of drug abuse or both."  Doc. 448, at 83-84.

While disagreeing with the Warden's contention that the aggravating evidence was so overwhelming additional mitigating evidence could not have made a difference, this Court nonetheless concluded that "Mr. Goodwin made an impassioned plea for mercy and did present mitigating evidence to the jury through Mr. Walden's testimony," that "the mitigating evidence Mr. Goodwin failed to present is neither compelling nor exculpatory," and that much of it was cumulative of the evidence presented at trial.  *Id.*, at 84.  Focusing on Stankewitz's mental health claims, and referencing numerous documents from the Jointly Filed Documents, this Court rejected the opinions of experts hired by Stankewitz during the federal post-conviction proceedings and concluded that substantial evidence at the time of the second trial supported the diagnosis of antisocial or sociopathic personality disorder made by the experts from the first trial.  *Id.*, at 16-18, 85.  This Court further concluded the record supported Goodwin's assertion that Stankewitz would not consent to the presentation of mitigating

evidence from family members, as no family members had testified at the first trial. *Id.*, at 85. Finally, this Court concluded that Stankewitz could not establish prejudice as it was not reasonably probable that additional mitigating evidence would have resulted in a life sentence given the circumstances of the crime, Stankewitz's extensive violent criminal history, and his continuation of violent behavior while in prison. Doc. 448, at 85.

The Ninth Circuit, after affirming this Court's denial of the petition in all other respects, remanded for an evidentiary hearing on the sole claim of ineffective assistance of counsel during the penalty phase of trial, holding that Stankewitz raised a colorable claim Hugh Goodwin, his attorney at his second trial, rendered ineffective assistance by failing to give the jury mitigating information "that might have humanized Stankewitz," and that as a result Goodwin's performance fell below constitutionally acceptable professional standards. *Stankewitz v. Woodford*, 365 F.3d at 708, 720-22, 724. In determining whether Stankewitz had raised a colorable claim, the Circuit was compelled to view as true all of Stankewitz's factual allegations, included the long-disputed assertion that Goodwin had not obtained or reviewed any of counsel's records from the first trial.

New counsel was appointed to represent Stankewitz in his federal habeas proceeding December 18, 2007, and the parties subsequently agreed to brief the merits of the remanded claim based on the evidence currently in the record, with the provision that the briefing be without prejudice to a future request for an evidentiary hearing. Stankewitz filed his brief in support of the remanded claim November 19, 2008. Doc. 587. Respondent Robert Wong ("the Warden") filed his opposing brief February 18, 2009. Doc. 589. Stankewitz filed his reply brief May 29, 2009. Doc. 597.

**Standard of Review**

The standard for ineffective assistance of counsel claims is set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).  Stankewitz must establish that his counsel's performance was deficient and that the deficiency prejudiced the outcome of his trial.  *Id.* at 689, 694.  Counsel's failure to investigate and present mitigating evidence presents serious constitutional concerns.  *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000).  Both cases emphasize counsel's duty to conduct a thorough investigation, and *Williams* states that merely presenting some evidence does not discharge counsel's duty.  Rather, a penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.  *Stankewitz v. Woodford,* 365 F.3d 706, 715-716 (9th Cir. 2004) (citing *Wiggins* and *Williams*).

**Summary of the Parties' Respective Arguments**

Stankewitz argues he has presented sufficient evidence, which is largely uncontested, which supports the finding that Goodwin's performance at the penalty phase was deficient under the established principles governing counsel in capital cases, and that Stankewitz was prejudiced by Goodwin's failure to investigate and present any more than minimal mitigation at penalty, as well as present available evidence undermining aggravation.

The Warden argues in opposition that the established facts of this case have changed dramatically since the remand by the Ninth Circuit, especially the revelation of the fact that Goodwin did obtain and review the trial counsel's files from Stankewitz's first trial, and that those changes undermine the remanded claim and conversely support this Court's earlier rejection of the claim.

Stankewitz replies that despite the Warden's assertions, the great bulk of

1   facts in the record are uncontested and are more than sufficient to justify penalty

2   phase relief.  The Warden's arguments do not change the fact that (1) Goodwin

3   rendered deficient performance by not conducting an independent investigation,

4   not hiring investigators or experts, and presenting a minimal, cursory and

5   unpersuasive mitigation case, (2) Stankewitz was prejudiced by the jury's lack of

6   knowledge about his toxic upbringing; and (3) Stankewitz was further prejudiced

7   by Goodwin's failure to present available evidence that Stankewitz may not have

8   fired the shots that struck a police officer (aggravating evidence which was

9   presented by the prosecutor to show prior acts of criminal conduct).

10  **The Warden's argument**

11        Specifically, the Warden contends that Stankewitz's remanded claim

12  alleged Goodwin failed to adequately investigate and present available

13  mitigating evidence about his character and background.  In support of this

14  claim, Stankewitz submitted a lengthy description of Stankewitz's background

15  and upbringing, supported primarily by declarations prepared on his behalf and

16  in a few instances by references to official records (which were not filed), and by

17  a 1995 declaration from Goodwin stating he had not obtained or reviewed the

18  files of trial or appellate counsel from the first trial.  Stankewitz asserted that with

19  just the effort required to read the transcript from his first trial, Goodwin could

20  have presented some of Stankewitz's relevant background and history.

21        The Warden observes that some of the factual representations relied on by

22  the Ninth Circuit are untrue, and that Stankewitz now concedes Goodwin

23  obtained the files of counsel from his first trial, and reviewed them and the

24  transcripts.  This concession means the contrary statement in Goodwin's 1995

25  declaration was false, and that Goodwin was aware of virtually all of the facts of

26  significance to Stankewitz's current claim.

The Warden objects to Stankewitz's criticism of Goodwin for failing to present evidence of the violence, neglect, substance abuse and criminality within his family, asserting Stankewitz fails to adequately account for timelines which establish he had little exposure to these family members after age six.  The records suggest that from the time he was removed from his family at age six, until he murdered Theresa Greybeal in February 1978, at age 19, Stankewitz was with his mother for a total of no more than seven months, with his father for less than three weeks, and with his aunt Maggie Marquez for a total of no more than nine months.  While the record leaves little room for doubt about the failings of Stankewitz's parents, siblings and other family members, the Warden argues few specifics are provided about the first six years of his life, and Stankewitz does not attempt to correlate his accusations of family dysfunction to the relatively narrow periods of time he spent with his family.  The Warden contends that, while is it undisputed Stankewitz was taken from his home at age six after his mother beat him on two occasions, the record does not include suggestions of on-going physical abuse, pointing to statements by his mother that their father "never hit the children" and only spanked his sister once, that she "never really spanked any of the children," and that the beatings of Stankewitz were isolated and out of the ordinary.  *See* Petitioner's Supplement to Joint Submission ("SJS"), filed April 23, 2008, Doc. 556, Vol. 3, page 269, and Doc. 558, Vol. 9, page 1044.

The Warden objects to Stankewitz's criticism of Goodwin for failing to present mitigation from the time Stankewitz spent at Napa State Hospital ("NSH") and in the foster home of Ms. Bollmeyer, arguing the allegations of sexual abuse and inappropriate medication and placement at NSH, as well as out-of-control and disturbed behavior, requirement of heavy medication, and lack of basic life skills while in foster care, are based on the thinnest of evidence,

1    almost entirely drawn from a highly questionable source, Ms. Bollmeyer's

2    daughter Rosetta.

3         The Warden disputes Stankewitz's allegation that Goodwin should have

4    further investigated and presented evidence of impaired intellectual functioning

5    and brain damage, and contends the expanded record now before the Court

6    supports the prior finding that Stankewitz was not incompetent or suffering from

7    a mental disease or disorder.  The Warden also disputes the allegation that

8    Goodwin failed to present evidence of Stankewitz's drug use at the time of the

9    crime, asserting that evidence was presented of his drug use before the murder

10   and that the new evidence alleging Stankewitz used marijuana, heroin and

11   alcohol with his brother Willie in the days before the crime is not reliable and is

12   inconsistent with other evidence.

13        The Warden disputes Stankewitz's allegation that Goodwin should have

14   further investigated and presented evidence that Stankewitz's brother Johnny

15   was in the car during the 1973 CHP shootout, and that there was a strong

16   possibility Johnny, and not Stankewitz, was the shooter.  The Warden asserts

17   Johnny's statement does not provide evidence he was the shooter, but incredibly

18   attempts to lay blame for the shooting on his deceased friend Eddie Davis,

19   contending that Eddie fired the shotgun out the passenger window or out the

20   back window through the small crack under the open trunk while keeping his

21   foot on the accelerator and having Stankewitz steer the car.  Even if this evidence

22   is viewed as raising a doubt that Stankewitz was the shooter, the Warden

23   contends that at a minimum Stankewitz aided and abetted the shooting, so a

24   tactical choice not to present such evidence was reasonable and understandable.

25   **Stankewitz's Allegations of Non-Presented Mitigation**

26        Stankewitz's factual allegations of potential mitigation fall into three

categories: (1) childhood of abuse/ neglect; (2) history of mental illness; and (3) substance abuse/ lack of sleep prior to the murder.  In the first category, Stankewitz submitted agency documents detailing the abuse and neglect which resulted in his removal from home at a young age, numerous declarations from family and friends relating the poverty and abuse (both physical and mental) suffered by Stankewitz in his home, and medical records and declarations indicating the difficulties Stankewitz experienced in subsequent state institutions and foster homes.  Of the 16 allegations in the first category, most are shown by government or medical records, although some have questionable support.

1-A.   Stankewitz's difficult and traumatic youth, up to age six, included:

    a.    a psychiatrist's description of his home as "totally lacking in love, warmth and affection and frequently filled with deprivation, rejection and punishment;"

    b.    a poverty-stricken household where there was often not enough food for the children;[1]

    c.    a house that was dirty, filled with vermin and without running water or electricity;[2]

---

[1] Stankewitz's parents, Marian Sample and William R. "Sonny" Stankewitz, were married 1/18/55 - at which time his mother already had two children: Frank Montgomery (dob: 1951) and Gary Lewis (dob: 6/7/54).  Marian and Sonny had nine children: Glenda, born 8/17/55; William "Willie" & Wilma "Tillie", twins born 3/26/57; Douglas, born 5/31/58; Johnnie, born 8/17/59; Roger, born 1/2/61; Rhonda, born 1/24/62; Teddy, born 2/12/64; and Rodney, born 3/29/66.   At the time Stankewitz was removed, there appear to have been nine children in the home - Rodney was not yet born, and a March 1965 report does not list Frank Montgomery with the other children in the home (which is consistent with a report that Frank lived with his maternal grandmother until he was 15).  SJS 0073, Doc. 556, Vol. 1. The ages of the children at home when Stankewitz was removed, in February of 1965, were: Gary 10, Glenda 9, Willie & Tillie 7, Douglas Stankewitz 6, Johnnie 5, Roger 4, Rhonda 3, and Teddy 1.

[2] Although the Stankewitz house was reported to be dilapidated but clean in a March 1965 report, 1965, SJS 0071 (Doc. 556, Vol. 1), subsequent inspections

d.     starting to sniff paint by age five, and soon expanding into the use of alcohol and harder drugs[3];

e.     physical and mental abuse by both parents - being taken to the emergency room three times before his first birthday[4];

f.     a mother who drank excessively while pregnant with him, was also physically abused by his father, who struck her repeatedly in the abdomen;

g.     a violent father of Native American descent who ridiculed him for being light-skinned and told him not to take medication prescribed to control his behavior;

h.     a mother who beat him so badly with an electrical cord at age six that she was jailed and he was placed into state care[5];

i.     older siblings who also abused the younger ones, especially him[6];

j.     at least one scar, "a substantial indentation on his cranium," which remains as a reminder of the physical abuse.

---

revealed sub-standard living conditions in October 1967, SJS 2055 (Doc. 559, Vol. 18, relating filthy conditions and neglect of minor children) and September 1969, SJS 2039 (Doc. 559, Vol. 17, home "barely adequate," "care and control of said minors appears to be marginal").

[3] Stankewitz stated his increased drug and alcohol use began at age 11-12. SJS 235, Doc. 556, Vol. 2 (Dr. LaDue's 1989 psychological evaluation).

[4] The Warden asserts these emergency room visits were for routine childhood illnesses.

[5] The Warden asserts the record does not include allegations of on-going physical abuse, pointing to Marian's statements that Sonny "never hit the children" and only spanked Glenda once, that she "never really spanked any of the children," and that the beating of Stankewitz was isolated and out of the ordinary. SJS 269, Doc. 556, Vol. 3, and 1044, Doc. 558, Vol. 9. This assertion is contradicted by Glenda's statement that Marian used to regularly beat all of the kids. SJS 1255, Doc. 558, Vol. 11, (Dec. 17, 1989 interview by Howard Liptzin, Solomon Investigations).

[6] The Warden contends the allegations regarding Frank Montgomery's abuse of his younger half-siblings are not applicable to Stankewitz, as he was removed from the home prior to Frank's living there, and Frank was in jail by the time Stankewitz returned home.

1-B.    Stankewitz's difficult and traumatic youth, after removal from his home, included:

     k.    being shuffled from one state institution to another after removal from home;

     l.    "care" at NSH that was indicative of the balance of his time as a ward of the state: he was sexually abused by hospital staff[7], heavily medicated and placed among psychotic and autistic children even though he was not similarly diagnosed;

     m.    upon transfer to the Bollmeyer foster home from NSH, he tore apart the back seat of the car, was "like a wild animal" and had to be held down by three teenage boys, was prescribed extremely high doses of medication, would often wet and defecate in bed, smeared feces on the wall, continued wetting the bed until at least age 12;[8]

     n.    Ms. Bollmeyer had to teach him to talk instead of grunt, use the toilet, dress himself, use silverware and ask instead of grab;

     o.    he was removed from the Bollmeyer home and spiraled through 22 subsequent placements in eight years;

---

[7] Contradicting this assertion, Stankewitz stated his first sexual experience was at age 10 in a foster home, and he recalled it as pleasurable.  SJS 227-228, Doc. 556, Vol. 2 (4/78 interview by Ross Becker).

[8] Some of these allegations are questionable.  The facts in subsections m. and n. are not consistent with reports of Stankewitz's behavior as related in NSH records.  To the extent the source for the allegations is the foster mother in Sebastopol, Ms. Bollmeyer, her credibility may be undermined in light of lies that she told to Stankewitz's teacher, Mrs. Hunt (i.e., that Stankewitz and his siblings were kept in cages by their parents, that he couldn't stand up straight because his cage was too short, that his siblings were also at NSH).  *See* SJS 822-24, Doc. 558, Vol. 8 and SJS 821A, Doc. 561.  If the source is Ms. Bollmeyer's daughter, Rosetta, her credibility is undermined by statements from her brother Rick of the conflict between Rosetta and their mother and Rosetta's resulting animosity toward the foster children, *see* SJS 14, Doc. 556, Vol. 1, and by inconsistencies between her allegations and statements made by Stankewitz.

p.     from his placement at NSH until his arrest for the murder, a total of nearly 13 years, he spent all but 16 months in some form of government care, during which he was massively and unnecessarily drugged, tied to beds, beaten, sexually molested, neglected, deliberately tortured, and otherwise abused by staff.

In the second category, Stankewitz submitted opinions of three experts who agree he is brain-damaged, as well as expert testimony from the first trial that he appeared "not to fully appreciate the flow of events or the full implications of his actions," and medical reports indicating mental or emotional problems when he was a child.  Although the Ninth Circuit observed that some of the habeas experts' conclusions were rejected in denying Stankewitz's guilt phase claims of diminished capacity and insanity, they stated the remaining conclusions "could have invoked sympathy from at least one juror," especially when considered in conjunction with other mitigation.  *Stankewitz v. Woodford*, 365 F.3d at 718 n.6.

2.     Stankewitz's history of mental illness:

a.     an expert at the first trial testified he appeared "not to be fully able to appreciate the flow of events or full implications of his actions;"

b.     all three habeas experts agreed he is brain-damaged;

c.     Dr. Riley opined he is borderline mentally retarded, with an IQ of 79, and suffers from significant brain dysfunction, perhaps attributable to Fetal Alcohol Syndrome and childhood abuse;

d.     Dr. Rosenthal said his brain damage "would produce problems with emotional control, tendencies to be impulsive and unpredictable, and to be unable to exercise adequate judgment or to understand the consequences of his behavior.  Furthermore, from early childhood

1       Mr. Stankewitz had intense mood shifts, profound depressions with

2       suicidal tendencies, psychotic thinking, an inability to relate to

3       reality in a rational manner, and paranoid delusional thinking;"

4   e.    a report at age 12 reveals he suffered from problems with a "sudden

5       loss of control, during which he becomes abusive, uses vile

6       language, and actually becomes combative."  During one of these

7       fits, he was placed in a padded room at Juvenile Hall and was

8       observed "actually biting the walls."

9       In the third category, Stankewitz submitted numerous declarations

10   detailing his severe substance abuse starting at age 10, and a co-defendant's

11   declaration that Stankewitz injected heroin just prior to the murder.  Only the

12   allegations that Stankewitz was sleep-deprived at the time of the murder and that

13   the heroin dose was the "largest he'd ever had" have questionable support.

14   3.    Stankewitz's substance abuse and lack of sleep prior to the murder:

15   a.    he claims that, for at least the 48 hours before the murder, he had

16       binged on substantial quantities of alcohol, heroin and

17       methamphetamine, and had not slept;

18   b.    he also claims to have injected the largest dose of heroin he had ever

19       taken shortly before the murder, which he claims lessened his

20       already diminished ability to control his behavior;

21   c.    he had a "very severe" substance abuse problem dating back from as

22       early as age 10 or younger which likely aggravated his unstable

23       emotional state and limited mental capacity.

24   **Analysis**

25       Even accepting the Warden's objections to some of Stankewitz's

26   allegations, the evidence shows Stankewitz was already severely emotionally

damaged by the time he was removed from his home at age six.  He was out of
control and exhibited acting out behavior, had frequent temper tantrums,
including hitting, kicking and biting, and was often only controlled with extreme
measures (restraints or drugs).  SJS 056-057, Doc. 556, Vol. 1 (March 1965 letter
from Probation Officer Joe Walden).  "While in the County Hospital, the minor
presented almost uncontrollable behavior problems and the hospital staff had to
use physical restraints to keep Douglas under control. . . .  He was transferred to
[a] foster home by a social worker and while in route, he ran away from her and
when she caught him, he kicked and hit her before she was able to subdue him.
His placement in this foster home lasted for only 24 hours due to the fact that the
foster parents were not able to control Douglas.  While in the first foster home,
Douglas threw chairs and threatened to run away and kept the foster parents
awake all night long.  The following day, this officer and a social worker
transported Douglas to a second foster home.  Upon arrival there, Douglas
attempted to run away and kicked and hit this officer, as well as attempting to
bite him.  The foster parents were unable to control Douglas and he was removed
from this foster home eight hours later and placed in Juvenile Hall . . . ."  SJS 87-
88, Doc. 556, Vol. 1 (Dec. 8, 1965 probation report by Joe Walden).

Stankewitz was somewhat stable for the four years he spent in Ms.
Bollmeyer's foster home in Sebastopol, although he was eventually returned to
Fresno in 1970 at Ms. Bollmeyer's request because he was uncontrollable.  By
then, at age 12, Stankewitz had "many emotional problems . . . and at many
times, [wa]s hostile and require[d] physical restraint to be used in order to
control him. . . . when he [wa]s pressed or put in a frustrating situation, he often
react[ed] by becoming violent."  Despite these problems, the evaluation of
Stankewitz's prognosis was good, and it was believed that with the planned

1    involvement in his case, he would come around and learn to control his

2    emotional outbursts.  SJS 105-106, Doc. 556, Vol. 1 (May 1970 report by Probation

3    Officer Roger Nelson).

4         However, in 1971 the assaults on others began: August 9 - he was with

5    three adults during an assault and robbery of an older man; August 19 - he hit

6    and injured a smaller boy at Juvenile Hall.  In 1972, he was sent to CYA, mainly

7    for being out of control.  At this point, Stankewitz had been through *at least* 14

8    placement changes in the 25 months since his removal from the Bollmeyer foster

9    home.  After nine months in CYA, he was paroled to his aunt Maggie Marquez,

10   and then went to live with his mother when she was paroled to Fresno.

11        On April 24, 1973, just three and a half months after his release from CYA,

12   Stankewitz was involved in the assault of George Key and robbery of his car, and

13   a subsequent CHP chase and shooting, which ended with the killing of co-

14   participant Eddie Davis.  Stankewitz was returned to CYA, where he exhibited

15   "no remorse for what had happened - except that he had been caught, no

16   assurance that parallel occurrences would not happen when again on the streets.

17   . . . Doug feels no responsibility for depriving anyone of property, health or even

18   life, enjoying the excitement of the chase.  Although ingratiating and pleasant, I

19   have come to believe this to be surface stuff only.  I look upon this youth as

20   dangerous."  SJS 164, Doc. 556, Vol. 2 (June 1973 Youth Authority report by

21   Edward Mueller).

22        The reports from this period also indicate (1) Stankewitz was extremely

23   violence prone, and diagnosed with an antisocial personality; (2) there were

24   numerous incidents at CYA during which Stankewitz relied on prison-type

25   intimidation and pressure in his interaction with other wards, and was not

26   amenable to influence or external controls by the authorities; and (3) Stankewitz

1   saw aggressive behavior, even hurting or killing others, as the solution to his

2   frustrations.

3       He was furloughed to his aunt Maggie Marquez after two and a half years

4   in CYA, but arrested on battery charges six days later.  He was returned to CYA,

5   and paroled after three and a half months.  By this time, at age 18, he was

6   hardened by the years of criminal associations and surroundings.  Stankewitz

7   had a "deprived background, being institutionalized early in his life and

8   essentially raised in institutions.  He has a history of assaultive behavior, both in

9   the community and in Youth Authority institutions."  SJS 007, Doc. 556, Vol. 1

10  (May 1977 Probation Report by Dean Thompson).  "From an early life

11  developmental standpoint, [Stankewitz] has suffered from early childhood

12  losses, prolonged separation from parents, poor institutional surrogate care.  This

13  has resulted in poor social adjustment as manifested by frequent runaways,

14  behavior problems, scholastic under-achievement and finally culminating in anti-

15  social behavior which has occurred both in and out of institutional placements."

16  SJS 228, Doc. 556, Vol. 2 (May 1978 Social Evaluation by Ross Becker).

17      Stankewitz was arrested two and a half months later and although the

18  initial charges were dropped, he was charged with assault on a booking officer

19  and sentenced to county jail.  He was released after nine months on January 14,

20  1978.  He and an accomplice (who had a gun) robbed a gas station on January 20,

21  and later the same night he robbed two massage parlor customers.  On January

22  25, he assaulted customers of a Sacramento card room and attempted to commit

23  robbery.  On February 8, 1978, he and his accomplices kidnapped, car jacked, and

24  ultimately murdered Theresa Graybeal, then later the same evening attempted to

25  rob Jesus Meraz, a.k.a. Valenti Cordero.

26      Although some of the mitigation allegations in the first category (listed on

1   pages 8-11 above) have limited support or are undermined by other documents,

2   the record as a whole shows Stankewitz was psychologically and emotionally

3   damaged by his upbringing.  *See* Summary Chronology of Stankewitz's

4   Childhood, Appendix A.  Dr. James Missett testified at the first trial Stankewitz's

5   upbringing included the criteria for developing an anti-social personality.

> [T]he criteria we look for [in the development of an antisocial personality] are perhaps 20 in number, most of which Mr. Stankewitz has shown at one time or others [sic]. . . . There is a history of sociopathic or violent behavior in the home.  There's very often a history of the individual being abused, especially physically, but not necessarily just physically.  If there is [sic] a lot of put-downs in the home, that, also, can contribute to it.
> There is, in the individual's family, usually, histories of alcoholism, sometimes, but again not always, criminal behavior, difficulty with work, difficulty in marital relationships, a history of disregard for societal institutions sofar as the importance of school in one's life, the importance of work, the importance of obeying laws, or in any way responding to what the dictates are of society.  There's – in the individual, himself – and this was evident, also, in Mr. Stankewitz, a history of bed wetting that goes beyond the usual accepted time of it stopping.  The usual accepted time of it stopping is sometime between age three and four.  Mr. Stankewitz went – had episodes of bed wetting up through ages 10 and 11.  There are also episodes of fire setting, and I don't remember if he had episodes of fire setting or not, of truancy, difficulty with all types of authorities, outside the home, of poor work habits.  As far as I know he has none.  I'm not aware of his having been exposed to that situation at all, a tremendous amount of difficulty with peers, with anybody in relationship of authority.

19   1978 trial RT, Vol. 22, pages 4697-98, testimony of Dr. James Missett; SJS 661, Doc.

20   557, Vol. 6 (Summary of mental health expert testimony by Quinn Denvir).

21   The Ninth Circuit made the following findings on remand: (1) "Stankewitz

22   has alleged facts that, if true, would establish that Goodwin was ineffective for

23   failing to investigate and uncover the important mitigating evidence outlined

24   above," *Stankewitz v. Woodford*, 365 F.3d at 722; (2) "[a] more complete

25   presentation, including even a fraction of the details Stankewitz now alleges,"

26   could have made a difference in Stankewitz's sentence, *id.*, at 724; and (3) "there

1  was a reasonable probability that the jury would not have sentenced Stankewitz

2  to death had it been presented with the evidence of the numerous deprivations

3  and abuses Stankewitz alleges that he suffered." *Id.*, at 725.  Since many of

4  Stankewitz's allegations are proved by official documents in the record, the

5  requirements for his ineffective assistance of counsel claim as set forth in the

6  remand opinion are satisfied.  Even assuming that Goodwin's decision not to

7  present the entirety of the available mitigating evidence was a tactical choice, the

8  Ninth Circuit found such a choice unreasonable, and the result prejudicial.  *Id.*

9  **Order**

10         Having considered all the pleadings, lodged and expanded records,

11  submitted evidence, and arguments of the parties, the Court determines, as

12  detailed above, that many of Stankewitz's allegations of mitigation evidence are

13  true.  Stankewitz's petition for a writ of habeas corpus is granted as to the

14  remanded claim alleging ineffective assistance of counsel at the penalty phase of

15  his second trial.  A writ of habeas corpus shall issue directing the State of

16  California to vacate and set aside the death sentence in *People v. Douglas Ray*

17  *Stankewitz*, Fresno County Superior Court Case No. 227015-5, unless within 90

18  days of the entry of judgment of this order, the State of California initiates

19  proceedings to retry Stankewitz's sentence.  In the alternative, the State of

20  California shall re-sentence Stankewitz to life without the possibility of parole.

21         The Clerk is directed to enter judgment in this case.

22  IT IS SO ORDERED.

23  DATED:    September 21, 2009

24                             /s/ Anthony W. Ishii

25                          Chief United States District Judge

26

Appendix A

Summary Chronology of Stankewitz's childhood

Excerpts from Jointly Filed Documents (Notice of Filing: Doc. No. 443) and

Supplemental to Joint Submission Documents (Doc. Nos. 556-559, 561).


5/31/58        Date of Birth, Douglas Stankewitz

11/18/64       reported beating to Fresno Police Department, police picked him up
               "in shock," Sonny was in jail

2/13/65        taken to police by neighbor, found at their door after beating

2/26/65        in Fresno Co. Hospital (removal from home due to abuse)

3/9/65         released from hospital

3/9-10/65      2 unsuccessful foster home placements, runaway threats & attempts,
               threat to throw chair/self through window, hitting, kicking, etc.

3/10-23/65     in Juvenile Hall pending placement, problems in younger boys unit,
               transferred to girls unit

3/11/65        Psych Eval., Dr. Simmang: erratic and unpredictable behavior,
               required restraints, rapid mood changes, average normal
               intelligence, no signs of psychosis, recommend further exam at Napa
               State Hospital

3/16/65        Joe Walden (Fresno Co. Probation) letter to Napa State Hospital
               requesting admission

3/23/65        Napa State Psychiatric Hospital (uncorroborated allegations of
               sexual abuse while here, assumption made by Rosetta Bollmeyer
               based on ambiguous statement by Stankewitz)

3/25/65        Donn Beddle, Ph.D.: average intellectual potential, difficulties
               controlling himself emotionally

5/24/65        C.W. Brackenridge, Ph.D.: mild hyperactivity, some aggressiveness,
               IQ of 85

6/16/65        Napa Hospital: diagnosis of adjustment reaction of childhood,
               conduct disturbance;  emotionally disturbed, severe tantrums,
               extremely aggressive behavior, immature speech

11/12/65       letter recommending discharge from Napa Hospital and for foster
               care, diagnosis - not mentally ill

ORemandClmStnk                              i

| | | |
|---|---|---|
| 1 | 12/15/65 | released from Napa Hospital, no appropriate foster homes in Fresno |
| 2 | 4/1/66 | placed in Santa Rosa/Sebastopol foster home of Rosamond Bollmeyer |
| 3 4 | 1968 | Stankewitz alleges first sexual experience about age 10, also same approximate age began sniffing paint/gas, using wide range of drugs & alcohol including hallucinogens |
| 5 6 | 2/10/70 | removed from Bollmeyer's home (Bollmeyer stated he was difficult to handle, uncontrollable and requested his removal) |
| 7 8 | 2/17/70 | returned to Juvenile Hall by new foster parents, who stated he was out of control (over next 6-7 weeks: rotated between being with mother, in foster care or juvenile hall) |
| 9 10 | 4/30/70 | police report of Stankewitz & his brother chasing & threatening girls at Dinkey Playground, mother says she had sent him to Juvenile Hall numerous times as she could not control him at home |
| 11 12 | 5/6/70 | Psych Eval. w/ EEG, Dr. Zeifert: sudden loss of control, becomes abusive, uses vile language, combative, ample evidence of neurotic disturbance (bitten fingernails and bed-wetting) may be due to emotional instability, recommend stable program & medication |
| 13 14 | 5/20/70 | probation report: adjustment in Juvenile Hall has been less than satisfactory, numerous write-ups regarding his behavior have often resulted in the use of physical restriants & holding room |
| 15 16 | 5/25/70 | James Caffee, M.D.: although abnormal EEG, doubt outbursts are caused by seizure because triggered by frustration and not followed by sleep, no evidence of psychic depression |
| 17 18 | 5-6/70 | various tests, treatments ordered by juvenile court |
| 19 | 6/30/70 | letter from probation officer recommending private school |
| 20 21 22 | 7/24/70 | C.W. House, Ph.D.: impulse-ridden child, normal intelligence, but processes are impaired regarding judgment, impulse control, appreciation of rules and regulations, limited concern for the needs of others, severe characterological disorder, impulses expressed without concern for the consequences |
| 23 | 8/11/70 | to Borrego Palms School |
| 24 | 11/24/70 | transfer to Awhanee Schools (closer to home) |
| 25 | 4/14/71 | ran away to mother's house, taken to Juvenile Hall when refused to return to Awhanee |
| 26 | 5/6/71 | Probation Report/Social Study, Juvenile Ct, ran away from Awhanee |

ORemandClmStnk

ii

| | | |
|---|---|---|
| 6/15/71 | with aunt Maggie Marquez |
| 8/9/71 | return to Juvenile Hall (assault/robbery), 2 weeks prior spent with uncle Joe Lopez around Fresno |
| 8/19/71 | Incident report, Juvenile Hall, hit smaller boy, recommend transfer to A Unit |
| 8/31/71 | to aunt Maggie Marquez |
| 10/27/71 | to Juvenile Hall (probation violation, failure to attend school) |
| 2/22/72 | to father; spent much of this time at aunt Maggie Marquez's or on the streets, exposed to large quantities of drugs/violence with father's motorcycle gang |
| 3/13/72 | to Juvenile Hall (runaway) |
| 4/21/72 | received at NRCC (No. Reception Center Clinic) |
| 5/8/72 | Social Evaluation, NRCC, pre-CYA commitment |
| 5/18/72 | to Los Guilucos School |
| 6/5/72 | Transfer Report, Los Guilucos School, behavior hostile & aggressive, not able to accept rules, verbally and physically abusive, required force to restrain, recommend transfer to O.H. Close School |
| 10/4/72 | to NRCC, medical furlough |
| 10/6/72 | return to O.H. Close School |
| 12/7/72 | Placement Request, O.H. Close School: diagnosis of neurotic acting out, has made progress in controlling his temper, growing in self-awareness, doing well in school, continues to be a very unstable young man, recommend discharge to aunt Maggie Marquez |
| 1/11/73 | paroled to aunt Maggie Marquez |
| 3/9/73 | returned to mother after her return from LA following parole on manslaughter charge, probation report recommended it would be better if Stankewitz worked rather than attended school |
| 3/18/73 | arrested, drunk |
| 3/20/73 | released on parole |
| 4/24/73 | George Key assault/GTA, subsequent CHP chase & shooting of Eddie Davis |
| 6/11/73 | to NRCC |

| | | |
|---|---|---|
| 6/13/73 | Recommitment Report | |
| 6/26/73 | Social Evaluation, NRCC: "There was no remorse for what had happened – except that he had been caught, no assurance that parallel occurrences would not happen when again on the streets." Feels no responsibility for depriving anyone of health, property or even life, believe his ingratiating and pleasant characteristics are surface only, look upon him as dangerous. | |
| 7/6/73 | to O.H. Close School | |
| 8/5/73 | Psych Eval., Dr. Melges, "extremely violence prone," concur with dx of antisocial personality made by Edward Hodgson, M.D. at NRCC on 6/28/73 | |
| 2/8/74 | Psych Eval., Dr. Melges, 2nd session: substantial gains, would like to see some kind of moral sense, an ethical concern for others, despite improvements, at this stage Stankewitz sees man as an individual alone - hasn't grasped the concept of men interdigitating with others | |
| 2/27/74 | Probation Report, Juvenile Ct, recommend release to Aunt Maggie Marquez | |
| 4/6/74 | Psych Eval., Dr. Melges, 3rd session: Stankewitz initiated, difficulty controlling anger, quite overtly violent | |
| 5/6/74 | Transfer Order, O.H. Close School: since arrival not participated in academic or treatment programs, numerous incidents, grossly misplaced with other 16 year olds due to physical size and reliance on classic prison-type methods of pressuring and intimidation, potential for threats & explosiveness, not amenable to influence or external controls, recommend transfer to Karl Holton School | |
| 5/30/74 | Psych Eval., Karl Holton School, Adolf Pfefferbaum, M.D.: slightly below normal intelligence, but may be from profound lack of insight, no evidence of hallucinations, delusions or psychotic thought process, sees aggressive behavior, hurting and even killing people as the solution to his frustration, agree with past dx of Sociopathic Personality, antisocial type, considerable allegiance to criminal element, potential for future violence is quite high | |
| 7/7/74 | Incident report, CYA, attempted escape | |
| 12/74 | re-evaluation at NRCC (7 write-ups at Karl Holton School): not motivated to change | |
| 1/9/75 | report: drug of choice - hallucinogens | |
| 2/7/75 | Psych Eval., Karl Holton School, A. Pfefferbaum, M.D.: 9 additional months for infractions, not motivated to change, no evidence of | |

| | | |
|---|---|---|
| 1 | | obsessions, hallucinations, thought broadcasting, suicidal ideation or severe depression, diagnosis of sociopathic personality, antisocial type |
| 2 | | |
| 3 | 3/17/75 | YTS (Chino), add'l 18 mos. for infractions (then 15 mos. cut for good progress, obtained high school diploma, taken college courses) |
| 4 | | |
| 5 | 7/20/75 | assault on employee of CYA |
| 6 | 10/3/75 | Psych Eval., S. Resnick, Ph.D.: diagnosis of antisocial personality, possible psychomotor epilepsy, no evidence of hallucinations, delusions, psychotic thinking or behavior, denies any depression |
| 7 | | |
| 8 | 5/1/76 | Disability Survey, Dx: Sociopathic personality |
| 9 | 8/4/76 | admission to Emotional Behavior Program rejected, prognosis for improvement via psychotherapy judged to be poor |
| 10 | 9/27/76 | Psych Eval., H.T. Rondeau, M.D.: no evidence of thinking disorder, disturbance in affect, delusions or hallucinations, oriented to time, place and person, guess IQ to be high normal, Dx: sociopathic personality, guarded prognosis but feel further institutionalization might reverse the gains he has made |
| 11 | | |
| 12 | | |
| 13 | 10/18/76 | 8 day training furlough, released to aunt Maggie Marquez |
| 14 | 10/24/76 | arrest, battery (returned to CYA) |
| 15 | 2/2/77 | paroled from CYA, to mother |
| 16 | 4/18/77 | arrest (charges dropped); scuffle with booking officers at the Sacramento County jail resulted in assault charges |
| 17 | 6/2/77 | sentenced |
| 18 | 1/14/78 | released from Sacramento Co. jail |
| 19 | 1/20/78 | robs gas station in Sacramento, accomplice with a gun; later same night robs two massage parlor customers |
| 20 | | |
| 21 | 1/25/78 | assault to commit robbery in card room, Sacramento |
| 22 | 2/8/78 | Theresa Graybeal kidnapping/murder; Jesus Meraz, a.k.a. Valenti Cordero attempted robbery |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |

ORemandClmStnk

v